THE PEOPLE OF THE STATE OF NEW YORK ex rel. GLENS FALLS INSURANCE COMPANY, Appellant, against GEORGE J. RUGG et al., Constituting the Board of Assessors of the City of Glens Falls, Respondents. (Glen and Bay Streets Building.)

Third Department, January 9, 1946.

*Louis P. Brown,* attorney (*Harold J. Hinman* of counsel), for appellant.

*Harry H. Singleton,* attorney (*C. E. Fitzgerald* of counsel), for respondents.

MEMORANDUM BY THE COURT. Authorities were not cited to sustain a 1⅓% rate of obsolescence or a 3¾% return upon investment. Assessors may consider elements other than capitalization of income. By adopting the usual 2% depreciation for obsolescence and a higher rate of return, the resultant quotient is somewhat below the assessment. The building is upon a location selected as peculiarly fitted for the home office of the taxpayer. It uses a major portion thereof for itself and its subsidiary and allied companies. The assessors are permitted to consider the intrinsic and economic value of the building to its owner, when there is no market in which such a building could be sold.

Orders affirmed, with costs.

LAWRENCE, J. (concurring). The real property of the relator is located at the intersection of Glen and Bay Streets, at Monument Square, in the city of Glens Falls, New York. It consists of a five-story building, with basement. The building is wedge-shaped. Its main entrance is upon Monument Square. The property frontage on Monument Square is 80 feet. The frontage of the building on Monument Square is 78 feet, 10 inches. The frontage of the lot on Glen Street is 151 feet. The frontage of the building on Glen Street is 126 feet, 10¾ inches. The frontage of the lot on Bay Street is 262.5 feet. The frontage of the building on Bay Street is 238 feet, 4¾ inches. Glen Street and Bay Street are not parallel. They intersect at an acute angle in front of the building. The building occupies nearly the whole of the lot except a driveway across the rear. The rear of the lot is much wider than the front. The property was assessed by the respondents for the year 1942, as follows:

| | |
|---|---|
| Land ................................ | $172,320.00 |
| Building ............................ | 802,420.00 |
| Total Assessment ................... | $974,740.00 |

The same assessment was made for the year 1943.

The relator filed a petition with the respondents for each year, stating that the full market value of the property was not more than $500,000, and that the assessment was erroneous and unjust by reason of the overvaluation to the extent of $474,740, and asked that the assessment be reduced to $500,000. No claim of inequality in the assessment was made. The assessment was not reduced. The relator then petitioned the court to review the assessments for the years 1942 and 1943. The issuance of writs was ordered. The writs were issued, returnable at Special Term. Separate returns for the years 1942 and 1943 were made by the assessors. The returns alleged that the assessments were for full value; that the value was not less than the assessments; that the assessments were just and fair, and asked that they be sustained and that the writs of certiorari be quashed and dismissed. A stipulation was made that the issues created by the petition and returns be transferred to the Honorable O. BYRON BREWSTER for hearing and determination. Orders upon such stipulation were made and entered. Lengthy hearings were held before Justice BREWSTER. By orders the assessments were sustained and the writs were quashed and dismissed.

An opinion was written by the Trial Justice. This appeal is from such decision and orders.

The testimony presented by the relator referred to the so-called "net earnings rule". It was claimed that such rule is the only one to be considered in the case at bar. The respondents contended that the situation which existed made applicable evidence of the value of the land, together with the reproduction cost of the building less depreciation. Respondents further contended that the net earnings rule, if properly applied, justified the assessments made. The trial court considered each of the above rules and found that either rule, if properly applied, would sustain the assessments.

The original building was constructed in 1912 and 1913. It was erected at a cost of $432,256.81. The cost of the original land in 1889, or thereabouts, was $25,000. An addition to the building was erected in 1928. This was upon Bay Street. The cost of construction of the addition, exclusive of the land, was $458,945.73. The additional land cost $15,000. Relator had an old office building upon the original site which was removed when construction was begun on the new building in 1912.

There is no property of a similar size, type of construction or use in the vicinity of Glens Falls. No building in that city or vicinity can be compared with it. The building fronts on the two principal main streets of the city and is a part of the business section. It is the home office building of the relator.

The relator began business as an insurance company in 1849. It now has some affiliated companies. The Commerce Insurance Company was acquired by the relator in 1923. It is housed in the same office building. All of its stock is owned, directly or indirectly, by the relator. The Glens Falls Indemnity Company was organized in 1927. It is housed in the same office building. All its capital stock is owned by the relator, either directly or indirectly. Relator and its two affiliated companies write all kinds of insurance except life insurance. Their activities extend to all parts of the United States and some parts of Canada. The Glens Falls Investing Corporation was organized in 1929. Its stock is held for the benefit of the relator. It is housed in the same home office building. The officers of the relator and the Commerce Insurance Company are the same. Some employees work for both companies. The combined income of the three companies from earned premiums in 1941 was $18,666,658.02. In 1942 it was $23,993,547.95. In 1928 the number of employees in the home office building was 213. In 1942, the number was 415.

| | |
|---|---:|
| The cost of the land about 1889 was..............;.... | $25,000.00 |
| The cost of the original building was.............. | 432,256.81 |
| The cost of the additional land in 1928 was........ | 15,000.00 |
| The cost of the addition in 1928 was..;........... | 458,945.73 |
| Making a total cost of..................... | $931,202.54 |

The question of the assessment of this property for tax purposes has been before the courts on previous occasions. The first occasion involved the assessment for the year 1913. At that time the first building had just been completed at a cost, as there noted, of $410,000, with an estimated value of the land at $30,000. At that time property in Glens Falls was assessed at about 40% of its value. It was then assessed at $250,000. This would result in a valuation of $622,000, or more than the cost of the land and the first building. Certiorari proceedings, upon the complaint of relator, were conducted before Justice CHARLES C. VAN KIRK. He determined that, under the rule of cost of production, the cost of construction, which was then just completed, and the value of the land would require a reduction of the assessment. He then proceeded to determine the value for tax purposes by the net earnings rule, stating that rule to be more controlling. He adopted 5% as a fair return on the investment. He reduced the assessment. His opinion was affirmed by the Appellate Division. (*People ex rel. Glens Falls Ins. Co.* v. *Howe,* 167 App. Div. 945.) In the case at bar the land is presumed to be assessed at 100% valuation.

The next time the value of this property for tax purposes was before the court the assessment for 1926 was involved. The matter was referred and the referee adopted the rule of net earnings announced by Justice VAN KIRK. His report was confirmed by Justice JOHN C. CRAPSER at Special Term. The Appellate Division affirmed the decision made at Special Term. (*People ex rel. Glens Falls Ins. Co.* v. *Pierce,* 222 App. Div. 706.) It would therefore seem that in previous certiorari proceedings the net earnings rule was adopted as a proper method of fixing valuation.

Respondents argue that conditions in 1942 and 1943 were not the same as they were at the time of the prior proceedings for the reason, among others, that relator occupied more space for its own use during those years and that the building is now used as a home office building almost entirely and not for commercial or investment purposes.

In 1941, there was a general reassessment of the taxable property and real estate in the city of Glens Falls. In that year and on behalf of the city, J. M. Cleminshaw and Associates, appraisers for tax purposes with extensive experience, were engaged to make a revaluation of all the real property in the city for tax assessment purposes. The associates followed what is stated to be a well-established practice for valuation and arrived at the value of each parcel in the city. They followed what is designated as the front foot rule, material and labor costs in Glens Falls, earning capacity of buildings, recent sales, corner influence table and rule, and things of that nature. They submitted all valuations to the assessors for whom they were acting.

In August, 1941, the Mayor of the city appointed a committee of twenty-five members to give consideration to the proposal for a revaluation of all the property in the city. This committee consisted of lawyers, real estate appraisers and brokers, business men and contractors.

In determining the value of the property of the relator the appraisers had access to the drawings and original plans of the building. Measurements were checked. Construction was checked against the drawings. Cost of material was checked. The reproduction cost of the original building in 1941 was found to be $822,460. The reproduction cost of the 1928 addition was found to be $334,778, in 1941, because some consideration should be given to unit costs of the entire building as a whole. Thirty-five per cent depreciation was allowed on that part of the building constructed in 1912. Twenty per cent depreciation was allowed on that part of the building added in 1928. In one case a little over 1% was allowed yearly; in the other case a little less than 1½%. From such data the following resulted:

|  | Reproduction Cost | Depreciation Allowed | Present Value |
|---|---|---|---|
| Original building ... | $822,460 | $287,861 | $534,599 |
| Addition ........... | 334,778 | 66,956 | 267,822 |
|  | $1,157,238 | $354,817 | $802,420 |

The last figure is the amount of the assessed value of the buildings under review.

The value of the lands of relator was determined by the appraisers by using the foot front and other rules approved by the committee, and by various rules of different appraisal companies as applied to local conditions. This resulted in a

land value of $172,320, which is the amount of land valuation under review.

The appraisers found the expected life of the building in 1941 to be seventy-five years.

If the rule of cost of reproduction less depreciation is to control, it would seem that the assessment is proper. The relator takes the position that such method is ruled out by the adoption of the net earnings rule in the prior certiorari proceedings involving the same property.

In considering the application of the net earnings rule, it should be kept in mind that the operations of the relator have been steadily extended. More space is needed for the activities of relator and its affiliates. Tenants are evidently becoming fewer in number. Additional land is being acquired for expansion purposes. Past conditions and present and future plans have tended to convert the present building into a larger home for relator and its affiliates. It is apparent that all of the present building is, or soon will be needed. Otherwise plans for expansion would not be contemplated. Under such circumstances complete occupancy of all space should be the rule adopted in fixing rentals.

The relator, in determining the value based on net earnings, computes as yearly income the amount of space occupied by tenants, consisting of 27,462 square feet, at an average yearly rate of $1.51 per square foot, and finds such annual income to be............................... $41,473.00

Then the relator computes the yearly income from space occupied by the Indemnity Company, consisting of 26,563 square feet, at the average yearly rate of $1.37½ per square foot, and finds such income to be the sum of................. 36,524.00

Relator then computes the income for the combined space occupied by the insurance company and other affiliates of 23,048 square feet at $1.37½ per square foot, and finds the income from such source to be.................................. 31,690.00

Making the gross total yearly rental......... $109,687.00

Recapitulation tables were submitted by the relator. Such tables, prepared as of October, 1942, show yearly rentals from all sources, computed on a full occupancy basis except the basement, to be $116,039.16 instead of $109,687.

Relator submits another recapitulation table relating to maintenance costs for various years from 1933 to 1942 inclusive, with an average for the last three years. This table includes items for fuel, light, supplies, labor, taxes, miscellaneous repairs and extra help. The average maintenance is stated to be $63,570, after deducting average taxes of $24,910.

Relator submits another table of capital improvements for 1940, 1941 and 1942, and deducts one third of such capital improvements as having a life beyond 1942. Respondents claim some of these items are included in the miscellaneous repairs. The reduction so claimed is stated to be $7,369. Subtracting this amount from $63,570, claimed to be the average maintenance cost, results in the sum of $56,201, claimed to be the adjusted maintenance cost. To this relator adds one third of the excess coal purchased for 1940, 1941 and 1942, in the sum of $1,717, which the respondents challenge and which may be explained by shortages in weight. Relator adds an item of $1,944, representing the average cost of insurance, which respondents challenge but which seems to have been paid. Relator also adds an item of $2,500 for supervision which respondents challenge as unnecessary. By adding these three last-mentioned items, totalling $6,161, to the sum of $56,201, we obtain the amount of $62,362, which relator claims to be the average maintenance and operating costs. From the gross rentals claimed by relator is subtracted the amount of average maintenance and operating costs. This difference of $47,325 is claimed by relator to represent the net rentals.

Relator claims 5% to be a fair return on investment and 2% to be a fair rate of depreciation. To these percentages is added the average tax rate of .0345. The net rentals divided by this resulting decimal give, in round numbers, the sum of $460,000, which the relator claims is the value of the property for tax purposes.

Respondents submitted a rent schedule based on rates charged to tenants and the same applied to relator and its affiliates. This results in an annual rent from all sources of $133,520.48. Respondents adopt the maintenance and operating expenses as found by the trial court to be not more than $46,500. The respondents take this sum from the gross rentals and obtain the sum of $87,020.48. Respondents claim that the decimals to be used for purposes of computation are tax rate, .0345; return on investment, .03; percentage of depreciation, .0133. Respondents then divide the net rentals by the sum of the above

decimals. The result is $1,775,000, which is claimed by respondents to be the value of the property for tax purposes.

The trial court used gross rentals of $130,000 and maintenance and operating expenses at not more than $46,500, resulting in net rentals of $83,500. The court used the following decimals: Tax, .0345; depreciation, .0133; return on investment, .0375, and a resulting decimal of .0853. The amount of net rentals divided by this resulting decimal gives a quotient of $978,898, which, by such computation, represents the value of the property for tax purposes.

In 1941, there was a reduction in the amount of rent charged to relator and its affiliates from the amount charged in 1940 and previous years and reported to the New York State Insurance Department. This reduction amounted, in round numbers, to $13,000. There would seem to have been no reduction in the rate charged to tenants from 1937 to 1942. That would justify a finding that larger gross rentals should be used as a determining factor.

Relator contends that the rate of $1.375 per square foot charged to the relator was appropriate because the relator and its affiliates, as tenants, occupy the major portion of the building, and that the rate should be less for that reason. This contention should not be considered in the application of the net earnings rule. Respondents contend that under such rule there is no good reason why the value of space occupied by relator and its affiliates should be reduced below the rates which in prior years had been charged to tenants, in order to reduce income for tax purposes.

The parties do not agree upon the cost of maintenance and operation. Relator's computation finds such costs to be $62,362, based on an average for three years. Respondents find such costs to be not exceeding $46,500. The difference is largely due to the items of supervision, excess coal and insurance.

Relator argues that the assessment of its property in 1942 was increased a greater percentage than other property in the city. That would not seem to be very important if the net earnings rule is used.

Many statements in the evidence and data submitted are expressions of opinion on value. Some are set up arbitrarily as bookkeeping entries and determined by problems of management and intercompany relationship,

Relator's building was insured against loss by fire for $600,000 and against war damage in the sum of $750,000. That may be some indication of relator's estimate of the value.

The assessment is presumed to be correct. When all the testimony and data are considered as bearing upon the net earnings rule, it would seem that relator has not shown the assessment to be illegal because it constitutes an overvaluation.

The orders should be affirmed, with costs.

HILL, P. J., HEFFERNAN and FOSTER, JJ., concur in decision; LAWRENCE, J., concurs in a separate opinion; BREWSTER, J., taking no part.

Orders affirmed, with costs.